**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **TERRY W. MOORE,** | ) | **CASE NO. 4:06CV3116** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **LINDA S. MCMAHON, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Terry W. Moore ("Moore"), seeks review of a decision by the Defendant Social Security Administration[1] ("SSA"), denying Moore's application for disability insurance benefits filed under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq*. Moore originally filed his application on March 27, 2003.  Social Security Transcript ("TR") at 91–93.  The application was based on allegations that Moore has been unable to work since February 27, 2003, due to a stroke and its residuals.  TR 103.  The SSA, on initial review, denied Moore's claim on July 29, 2003.  TR 69.  Moore filed a request for reconsideration, and, after the SSA initiated another review, Moore's request for reconsideration was denied on January 14, 2004.  TR 63.

Moore filed a request for a hearing on February 6, 2004, and that hearing was held on July 7, 2005.  TR 53, 17.  Subsequent to that hearing, Administrative Law Judge ("ALJ"), Larry M. Donovan made several findings.  Those were, among others, the following:

---

[1] Linda S. McMahon has been appointed to serve as Acting Commissioner fo Social Security, and is substituted as Defendant, in her official capacity.

       3. The claimant's history of a CVA [stroke] and cognitive disorder not otherwise specified attributable to the same is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

       4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

       5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

       . . . .

       11. The claimant has the residual functional capacity to perform a significant range of light work . . . .

       12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, . . . there are a significant number of jobs in the national economy that he could perform. . . .

TR 28–29.  The ALJ upheld the SSA's decision, finding that Moore was not entitled to a period of disability or disability insurance benefits.  TR 30.

     On March 20, 2006, the Appeals Council denied Moore's request for review.  TR 6. Moore now seeks judicial review of his claim.  I have reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and the applicable law.  For the reasons stated below, I conclude that the ALJ's findings are not supported by substantial evidence on the record as a whole, and consequently I will remand the matter to the SSA for further proceedings consistent with this Memorandum and Order.

**Medical Background**

For purposes of this decision, a detailed recitation of the facts is not necessary.[2]

Moore was born on July 8, 1954, and was forty-eight years old on his alleged onset date

of February 27, 2003.  TR 91.  He completed school through the eleventh grade and

earned his GED.  TR 109.  He has work experience as a pre-cast concrete plant foreman,

loader operator, truck driver, corrections officer, production worker, sales representative,

and project development coordinator/technical support specialist.  TR 143.

Moore had a stroke on February 27, 2003, and was admitted to the hospital.  He

experienced residuals of some left-handed weakness, ataxia (loss of control of bodily

movement), mild dysmetria (lack of coordination of movement), difficulty walking, and

severe diplopia (double vision).  TR 200–01, 205–06; *see also* TR 22.  He was discharged

on March 7, 2003.  Moore was treated by Dr. Joseph LoPresti, M.D.  TR 199–200.  Upon

discharge, Moore was transferred to an acute rehabilitation unit for physical and

occupational therapy, which continued through March 18, 2003.  TR 236.  Moore had

follow-up care with Dr. LoPresti.  TR 261–64, 325.  On October 6, 2003, Dr. LoPresti stated

that Moore did not have double vision, but did have trouble swallowing and sleep apnea.

Further, Dr. LoPresti opined that Moore appeared to be more stable when he walked.  TR

325.

On October 31, 2003, Moore was seen on a consultative basis by Dr. Anne Talbot,

Psy.D., a psychologist.  TR 276–87.  Dr. Talbot concluded that Moore had a cognitive

disorder as a result of his stroke; had borderline to average memory function after testing;

---

[2]The majority of the facts that appear here are as set out in the Defendant's brief in opposition (Filing No. 14).

and had a "fairly strong" adaptive capability.  Dr. Talbot opined that it was unlikely that Moore's cognitive functioning would improve enough to allow him to return to his prior employment.  She noted, however, that he was adapting very well to living alone and was functioning as independently as possible.  TR 287.

Moore was also seen for a consultative neurological evaluation by Dr. Terry Mark Himes, D.O., an associate of Dr. LoPresti, in December of 2003.  TR 289–92, duplicated at 319–22.  Dr. Himes noted slightly diminished strength on the right side; normal vision; and that Moore had not "felt capable" of pursuing aggressive rehabilitation.  TR 292.  Dr. Himes stated that Moore "does not, in my opinion, appear to excessively exaggerate his mental or emotional complaints and he does appear to have significant deficits . . . ."  TR 291.  Further, Dr. Himes noted that Moore "has a sufficient deconditioning as a result of his stroke from a physical perspective that he could not be sustained . . . in physical duties and his own assessment of his ability to tolerate or cope with any stressful situation would appear to be accurate."  TR 292.

On January 13, 2004, Moore was seen by Dr. LoPresti to discuss, among other issues, a sleep study recently conducted on Mr. Moore. TR 318, 323–24.  Dr. LoPresti also noted that Moore's ambulation continued to be poor, and that he appeared to be depressed and cognitively slowed.  TR 318.

On January 29, 2004, Dr. LoPresti completed a medical source statement, indicating that Moore had marked limitations in understanding and remembering detailed instructions.  TR 328.  Dr. LoPresti also opined that Moore had marked restrictions in concentrating for extended periods, maintaining regular attendance, and completing a work week without interruption.  Dr. LoPresti noted that Moore had other moderate level limitations.  TR

328–29.  Dr. LoPresti also stated that Moore could sit or stand for fifteen minutes at a time and walk for forty-five minutes at a time; that he would need to lie down or recline at least one hour in an eight-hour workday; that he could rarely lift up to nine pounds and never lift more; that he could not perform fine manipulation and could never perform postural activities; and that he had continuous limitations in work with unprotected heights, moving machinery, marked temperature or humidity changes, automotive equipment, and dust and fumes.  TR 330–31.

In a separate questionnaire, Dr. LoPresti stated that Moore had burning sensations in his legs; had lower back and hip pain; had headaches three times a week for three hours or more; and had vertigo and fatigue.  TR 332.

Moore reported that his symptoms were the same on February 3, 2004.  He complained that he was unable to lift things, and had difficulty eating and swallowing.  TR 317.  On May 4, 2004, Moore complained to Dr. LoPresti of neck pain and fatigue, and medications were prescribed.  TR 316.  On June 14, 2004, Moore reported that he had not been taking the medication prescribed for joint and neck pain.  He also had not tried the medication prescribed for drowsiness.  He was given a prescription change.  TR 313.  In July of 2004, Moore complained of neck pain.  Dr. LoPresti noted that Moore had been taking Advil instead of a prescription medication because Medicaid would not pay for that prescription medication.  A medication change was made.  TR 312.  In August of 2004, Moore told Dr. LoPresti that his fatigue was improved on medications and his neck was less sore.  However, Dr. LoPresti stated that he was "still quite debilitated," and had problems with ambulation, fatigue, and uncomfortable sensations.  TR 311.  On September 18, 2004, Moore was seen by a doctor at a Veterans Administration ("VA") hospital, Dr.

James Johnson, M.D. TR 301–03. Dr. Johnson noted that Moore used no assistive device but moved slowly; swayed and was unsteady; and had poor tandem walking. TR 303. On February 16, 2005, Dr. LoPresti noted that Moore had been relatively stable until a recent problem with neck pain, but had been relatively stable from a neurological standpoint. TR 310. He complained of fatigue, and other aspects of Moore's neurological status were unchanged. TR 310.

## Standard of Review

When reviewing an ALJ decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir. 1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record as a whole is substantial, the district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal." *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991) (citing *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)).  If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision "merely because substantial evidence would have supported an opposite decision."  *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).  Rather, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

## Discussion

Moore contends that the ALJ made two errors in determining that Moore could sustain competitive employment.  The first suggestion of error relates to the ALJ's determination to give less than controlling weight to Moore's treating physician.  The second suggestion of error more generally charges that the ALJ's decision was not based on substantial evidence.[3]

---

[3]To allege that the ALJ's determination lacked substantial evidence is a somewhat nebulous charge, as the "substantial evidence" language referred to in case law pertains to this Court's standard of review.  However, after reviewing Moore's briefs, I have gleaned the main cognizable issue, which relates to the ALJ's RFC finding, and includes factual as well as legal challenges.  All of these issues are discussed in section B below.

**A. Treating Physician**

When reviewing the weight given by an ALJ to a treating physician's opinion, a district court will find error if the ALJ failed to consider or discuss that opinion and the record contains no contradictory medical evidence.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)).  A treating physician's opinion is not automatically controlling—it must be assessed against the record as a whole and may be discounted if it is inconsistent with other parts of the same opinion or inconsistent with the record as a whole.  *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).  Further, a physician's opinion that an applicant is disabled or unable to work is not the type of medical opinion an ALJ need give controlling weight, as it involves a legal conclusion reserved for the Commissioner.  *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted))).

In this case, Moore argues that the ALJ erred in not granting the opinion of Dr. LoPresti controlling weight.  The ALJ gave several reasons for his decision to grant "little

8

weight to the opinions expressed by Dr. LoPresti in [his] . . . medical assessments." TR 24. First, the ALJ concluded that Dr. LoPresti's opinions were not supported by sufficient medical evidence, finding instead that his treatment of Moore between July of 2003, and January of 2005, was "sporadic." TR 24. Second, the ALJ found several inconsistencies (i) within Dr. LoPresti's own opinions; (ii) between Dr. LoPresti's opinions and Mr. Moore's claimed functional abilities; and (iii) between Dr. LoPresti's opinions and the other medical evidence in the record. TR 24. Finally, the ALJ discounted Dr. LoPresti's opinions because "there is no indication Dr. LoPresti has any specialty in addressing psychological issues." TR 24.

First, I disagree with the ALJ's characterization of Dr. LoPresti's treatment of Moore as "sporadic." The ALJ focused on the time from July 2003 to January 2005. I note that Moore was seen by Dr. LoPresti on July 23, 2003, TR 261; October 6, 2003, TR 325; January 13, 2004, TR 318; February 3, 2004, TR 317; May 4, 2004, TR 316; June 14, 2004, TR 313; July 15, 2004, TR 312; and finally on August 25, 2004, TR 311.[4] Additionally, during that time, Moore was seen for an exercise tolerance test on October 21, 2003, conducted by Dr. Himes, the results of which were forwarded onto Dr. LoPresti, TR 323–24, along with a neurologic evaluation conducted by Dr. Himes and dated December 30, 2003, TR 319–22. This does not include the several other relevant doctors' examinations of Moore—which include a sleep study on October 21, 2003, TR 355; an

---

[4]The ALJ stated in his opinion that the "claimant is without further follow-up of treatment from Dr. LoPresti after July 2003 until January 2004 . . . ." TR 23. The record indicates that Moore was seen by Dr. LoPresti on October 6, 2003. TR 325.

emergency room visit on April 9, 2004, TR 348; and a VA hospital visit on September 17,

2004, TR 301–03—records to which Dr. LoPresti presumably had access. [5]

Second, I disagree with the ALJ's conclusion that Dr. LoPresti's opinions are

inconsistent within themselves, with Moore's own testimony,[6] and with other medical

evidence.   The ALJ first asserted that "a review of the medical narratives, records and

written reports of Dr. LoPresti indicate that conclusions rendered therein conflict with *a*

*medical assessment form* also completed by the doctor . . . ."  TR 24 (emphasis added).

The ALJ then afforded greater weight to the disability narrative,[7] and seemingly no weight

---

[5] Dr. LoPresti reported that, during the office visit with Moore on January 13, 2004, Moore "wanted to go over his sleep study."  TR 318.

[6]The ALJ cites to SSR 96-3p to support this conclusion.  SSR 96-3p has the following stated purpose:

> PURPOSE: To restate and clarify the longstanding policies of the Social Security Administration for considering allegations of pain or other symptoms in determining whether individuals claiming disability benefits under title II and title XVI of the Social Security Act (the Act) have a "severe" medically determinable physical or mental impairment(s). In particular, the purpose of this Ruling is to restate and clarify the policy that:
> 1. The evaluation of whether an impairment(s) is "severe" that is done at step 2 of the applicable sequential evaluation process set out in 20 CFR 404.1520, 416.920, or 416.924 requires an assessment of the functionally limiting effects of an impairment(s) on an individual's ability to do basic work activities or, for an individual under age 18 claiming disability benefits under title XVI, to do age-appropriate activities; and
> 2. An individual's symptoms may cause limitations and restrictions in functioning which, when considered at step 2, may require a finding that there is a "severe" impairment(s) and a decision to proceed to the next step of sequential evaluation.

SSR 96-3p, 1996 WL 374181 (S.S.A.) at *1 (July 2, 1996).  The ALJ's RFC conclusion, which utilized Moore's stated daily activities, is discussed below.  This Court's analysis with regard to Moore's daily activities, therefore, is not epeated here.

[7]The ALJ cited to 20 C.F.R. § 1527(4) and (d), presumably intending to cite to 20 C.F.R. §§ 404.1527(c)(4) ("When there are inconsistencies in the evidence that cannot be resolved, or when despite efforts to obtain additional evidence the evidence is not complete, we will make a determination or decision based on the evidence we have."), and 404.1527(d)(4) ("Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

to the medical assessment form (a disability checklist).  However, the ALJ stopped his analysis of internal inconsistency there.  Missing is an analysis on how Dr. LoPresti's disability narrative, records, and written reports, examined without the discounted assessment form, demonstrate that Moore is or is not disabled under the relevant regulations.  (*See* TR 24).  Rather, the ALJ used a single inconsistency in the record—in a document that the ALJ himself discounted because it "only contains 'check marks' or references back to the narrative report," TR 24, as a notable reason for discounting the entire doctor–patient relationship between Moore and Dr. LoPresti, a relationship which included several visits, lasted several years, and generated several reports.  While an ALJ, in finding internal inconsistencies, can find that a physician's opinion is "entitled to less deference than [that physician] would receive in the absence of inconsistencies," *Guilliams*, 393 F.3d at 803, the purportedly inconsistent report in this case does not rise to the degree of inconsistency that would merit the discounting of Dr. LoPresti's opinions.

In addition to the internal inconsistency, the ALJ noted conflict with "other medical evidence in the record which indicates that the claimant could work with certain restrictions."[8]   The ALJ cites to only one report, exhibit 12F, which is a neurologic

---

[8]Here, the ALJ cites to 20 C.F.R. § 404.1519p, which states:
 (a) We will review the report of the consultative examination to determine whether the specific information requested has been furnished. We will consider the following factors in reviewing the report:

(1) Whether the report provides evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses;

(2) Whether the report is internally consistent; Whether all the diseases, impairments and complaints described in the history are adequately assessed and reported in the clinical findings; Whether the conclusions correlate the findings from your medical history, clinical examination and laboratory tests and explain all abnormalities;

evaluation found at TR 289–92.  This evaluation was written after a partner of Dr. LoPresti,

Dr. Himes, examined Moore.  Dr. Himes, in that evaluation, stated that Moore "does not,

in my opinion, appear to excessively exaggerate his mental or emotional complaints and

he does appear to have significant deficits, but I do not have, at present,

neuropsychometric testing that would further document the extent of his impairments in

that regard." TR 291.  The cited evaluation, at most, indicates that the examining physician

needed to do more testing, but is certainly not the type of evidence that would permit

---

(3) Whether the report is consistent with the other information available to us within the specialty of the examination requested; Whether the report fails to mention an important or relevant complaint within that specialty that is noted in other evidence in the file (e.g., your blindness in one eye, amputations, pain, alcoholism, depression);

(4) Whether this is an adequate report of examination as compared to standards set out in the course of a medical education; and

(5) Whether the report is properly signed.

(b) If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.

(c) With your permission, or when the examination discloses new diagnostic information or test results that reveal a potentially life-threatening situation, we will refer the consultative examination report to your treating source. When we refer the consultative examination report to your treating source without your permission, we will notify you that we have done so.

(d) We will perform ongoing special management studies on the quality of consultative examinations purchased from major medical sources and the appropriateness of the examinations authorized.

(e) We will take steps to ensure that consultative examinations are scheduled only with medical sources who have access to the equipment required to provide an adequate assessment and record of the existence and level of severity of your alleged impairments.

20 C.F.R. § 404.1519p.

discounting the treating physician's opinion.  Moreover, the ALJ cites exhibit 12F as an

authority for the opinion that Moore can work with certain restrictions.  No such opinion

appears in exhibit 12F.[9]

Finally, granting less than substantial weight to a treating physician because that

physician is not a specialist is not the law of this circuit.[10]  In the Eighth Circuit, a treating

physician's opinions, regardless of specialty, are generally entitled to substantial weight.

However, if the physician happens to be a specialist, the SSA is encouraged to give *more*

*weight* (*i.e.*, more than substantial weight), if the medical issue on which the specialist is

rendering an opinion is related to that specialist's expertise.  *See Kelley v. Callahan*, 133

F.3d 583, 589 (8th Cir. 1998) ("A treating physician's opinion is generally entitled to

substantial weight, although it is not conclusive and must be supported by medically

acceptable clinical or diagnostic data.  The Commissioner is encouraged to give more

weight to the opinion of a specialist about medical issues related to his or her area of

specialty than to the opinion of a source who is not a specialist." (citations omitted)).  The

ALJ cited to no *specialist's* opinions that contradict Dr. LoPresti's opinions.  Consequently,

it was error to discount Dr. LoPresti's opinions because he was not a specialist.

---

[9]In fact, Dr. Himes states in exhibit 12F that "I believe [Moore] has a sufficient deconditioning as a result of his stroke from a physical perspective that he could not be sustained light, to me, in physical duties and his own assessment of his ability to tolerate or cope with any stressful situation *would appear to be accurate*."  TR 292 (emphasis added).

[10] The ALJ in this case cited solely to Tenth Circuit case law.  Because I am remanding this matter to the SSA, I will not conduct a thorough comparative analysis.  Upon remand, it is suggested that the SSA refer to case law that is binding on this Court, *i.e.*, the case law of the Eighth Circuit.

**B. Substantial Evidence on the Record—RFC and Subjective Complaints**

In general, the findings of an ALJ must be supported by substantial evidence on the record.  In particular, the Eighth Circuit Court of Appeals has characterized an RFC[11] finding as a "medical question," *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002), and therefore "some medical evidence must 'support the determination of the claimant's'" RFC, *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "[T]he ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace," *Lauer*, 245 F.3d at 704, and is accordingly "required to consider at least some supporting evidence from a [medical] professional," *id*.  However, an RFC assessment need not be based *solely* on medical evidence, but rather should be based on all "relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).   This includes observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of her limitations.  *Id.* §§ 404.1545(a)–(c), 416.945(a)–(c); *McKinney v. Apfel,* 228 F.3d 860, 863–64 (8th Cir. 2000).

Before determining a claimant's RFC, an ALJ must evaluate the claimant's credibility.   The *Polaski* standard is the guide in the Eighth Circuit for credibility determinations.  It provides, in relevant part:

> The adjudicator may not disregard a claimant's subjective complaints
> solely because the objective medical evidence does not fully support
> them. . . .  The absence of an objective medical basis which supports

---

[11]RFC is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).

the degree of severity of subjective complaints alleged is just one
factor to be considered in evaluating the credibility of the testimony
and complaints. The adjudicator must give full consideration to all of
the evidence presented relating to subjective complaints, including the
claimant's prior work record, and observations by third parties and
treating and examining physicians relating to such matters as:

1.      the claimant's daily activities;
2.      the duration, frequency and intensity of the pain;
3.      precipitating and aggravating factors;
4.      dosage, effectiveness and side effects of
        medication;
5.      functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective
complaints *solely* on the basis of personal observations. Subjective
complaints may be discounted if there are inconsistencies in the
evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984);[12] *see* 20 C.F.R. § 404.1529;

---

[12]Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a
claimant's statements is the consistency of the claimant's various statements and the consistency
between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ
must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical
> signs and laboratory findings and other information provided by medical sources,
> including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare
> statements made by the individual in connection with his or her claim for disability
> benefits with statements he or she made under other circumstances, when such
> information is in the case record. Especially important are statements made to
> treating or examining medical sources and to the "other sources" defined in 20 CFR
> 404.1513(e) and 416.913(e). However, the lack of consistency between an
> individual's statements and other statements that he or she has made at other times
> does not necessarily mean that the individual's statements are not credible.
> Symptoms may vary in their intensity, persistence, and functional effects, or may
> worsen or improve with time, and this may explain why the individual does not
> always allege the same intensity, persistence, or functional effects of his or her
> symptoms. Therefore, the adjudicator will need to review the case record to
> determine whether there are any explanations for any variations in the individual's
> statements about symptoms and their effects.

*Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003).  Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although each factor may not have been discussed); *Anderson*, 344 F.3d at 814.

In the Eighth Circuit, if an ALJ discounts a claimant's subjective complaints of pain, the *Polaski* factors must be acknowledged and considered.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004).  This does not mean that an ALJ needs to discuss explicitly each *Polaski* factor.  *Id.* (citing *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)).  Further, it is only the *factors* that the ALJ needs to acknowledge and consider, and the ALJ does not need to mention specifically the *Polaski* case.  *See Randolph v. Barnhart*, 386 F.3d 835, 842 (8th Cir. 2004) (comparing the *Polaski* factors to 20 C.F.R. §§ 404.1529(c)(3)(i)–(vi), (vii), & 416.929(c)(3)(i)–(iv), (vii), and noting that "the ALJ reviewed [the claimant's] testimony in light of the applicable regulations which largely mirror *Polaski*").  An ALJ must make an express credibility finding and give the reasons for discrediting the testimony, *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir. 1995), but as long as

----

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

an ALJ acknowledges the proper regulations and evidences the requisite factors' consideration, *Polaski* is satisfied.

In this case, the ALJ acknowledged the applicable regulations (*see* TR 21), and made an express determination to give less than full credit to Moore's subjective complaints.  However, this credibility analysis lacked a discussion of most of the factors *Polaski* directs an ALJ to consider.  In other words, while they were acknowledged, it is difficult to conclude that the requisite factors were, in actuality, considered.  Only two *Polaski* factors where appreciably analyzed in the ALJ's findings: (i) the claimant's daily activities and (ii) medications taken.

With regard to Moore's daily activities, the ALJ found that "he describes daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations preventing all work."  TR 25.  "The claimant lives alone and has not reported any particular help in maintaining the residence, other than a woman assisting . . . and . . .  he attends to his personal needs and hygiene, goes shopping for groceries and other items, washes dishes, does laundry, goes out to dine, attends to yard work such as watering the yard, reads newspapers and comprehends what he reads, and visits with family and friends."  TR 25.  Consequently, the ALJ found that Moore's stated daily activities did not fully support his subjective complaints of disability.

However, it is established law in this circuit that, "a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."  *Kelley*, 133 F.3d at 589.  While the daily activities in this case might constitute

*some* evidence, the types of activities cited by the ALJ do not, in and of themselves, provide substantial evidence for his credibility determination and, ultimately, his RFC finding.[13]

Along with the thorough discussion of Moore's daily activities, there is a brief analysis of his prescription record. *See* TR 25. However, this discussion is overshadowed by two matters. The first relates to Moore's smoking habit. The ALJ noted that "[w]hile the record indicates sleep apnea claimant testified he uses a C-PAP which helps his breathing and sleeping, and interestingly the undersigned notes the claimant continues to smoke tobacco." TR 25. While it is difficult to estimate the weight the ALJ accorded to Moore's failure to quit smoking, the ALJ made reference at least twice to Moore's continued smoking. However, I cannot find in the ALJ's opinion any indication that a physician told Moore that his condition would be worsened by continued smoking.[14] "[B]efore a claimant is denied benefits because of a failure to follow a prescribed course of treatment [in this case, to quit smoking], an inquiry must be conducted into the circumstances surrounding the failure and a determination whether quitting would restore the plaintiff's ability to work." *Burnside v. Apfel*, 223 F.3d 840, 844 (8th Cir. 2000). In this case, there is no discussion in the ALJ's opinion, nor citation to the record of relevant medical evidence, as to how Moore's smoking affected his ability to work. Absent such a discussion, this Court is

---

[13] Because I will remand the case to the SSA for further proceedings to reconsider, for example, the weight to be given to the treating physician's opinion, I will not further opine on the strength of this evidence. Rather, the SSA will reevaluate the evidence as a whole, and make its decision accordingly.

[14] The ALJ's opinion does not specify whether a physician told Moore *to quit* smoking.

18

unable to determine that the ALJ's decision is supported by substantial evidence on the record.

The second point discussed by the ALJ relates to Moore's failure to take all of his prescribed medications.  Significantly, the ALJ noted that "the claimant was not taking his prescribed Bextra for joint and neck pain and headaches, and he had not yet tried the Provigil that was prescribed for him . . . ."  TR 24.  As with the failure to stop smoking, it is difficult to determine what weight, if any, the ALJ accorded Moore's failure in this respect.  Regardless, the ALJ's analysis lacks a discussion of Moore's stated reasons for not following the recommended treatment course, *i.e.*, financial hardship.

It is the law of this circuit that "[a]lthough it is permissible in assessing the severity of pain for an ALJ to consider a claimant's medical treatment and medications, the ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances."  *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (citing *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984)).  In *Dover*, the claimant reported to his physicians that he had no financial resources to purchase the prescribed medical treatment, and it was found to be error to discount that claimant's subjective complaints of pain without considering the stated lack of financial resources.

The case at hand is very similar.  Dr. LoPresti noted that Moore told him "Medicaid will not pay for Bextra."  TR 312.  The ALJ's decision does not evidence consideration of this fact.  Accordingly, I find that reliance on Moore's failure to take Bextra as a factor to discredit Moore's subjective complaints of pain is reversible error.[15]

---

[15] It does not appear that the ALJ considered Moore's stated financial-related reasons for failing to take Bextra, nor that Moore was supplementing the Bextra with over-the-counter pain

When reviewing an ALJ's opinion not to extend Social Security benefits, a court will affirm the ALJ's opinion if it is supported by substantial evidence on the record.  In this case, I do not find substantial evidence supporting the ALJ's decision on the record as a whole, and consequently the matter is remanded to the SSA for further proceedings consistent with this Memorandum and Order.  My conclusion here does not prescribe any given result upon remand.  The remand is simply to assure that the correct legal standards are applied in reaching a decision, based on the facts of this case.

IT IS ORDERED:

1.      The findings and conclusions of the Commissioner are reversed;

2.      The matter is remanded to the Social Security Administration for further proceedings consistent with this Memorandum and Order;

3.      The Clerk will modify the caption of this case, to substitute Linda S. McMahon, Acting Commissioner, Social Security Administration, as Defendant.

DATED this 14th day of February, 2007.

> BY THE COURT:
>
> s/Laurie Smith Camp
> United States District Judge

---

relievers.  "Today the patient states that Medicaid will not pay for Bextra. . . . He has been taking Advil, 3 tabs twice per day.  Medications include . . . Coumadin and Tylenol and Advil."  TR 312.